957 F.2d 961
 Fed. Sec. L. Rep. P 96,472, RICO Bus.Disp.Guide 7909
 Stanley C. CRUDEN, Philip Zerylnick, individually and on
behalf of a class of persons similarly situated,
and Sibalin, S.A., a corporation,
Plaintiffs-Appellants,
v.
The BANK OF NEW YORK, a corporation; Irving Trust Company,
a corporation; Sterling National Bank & Trust Company of
New York, a corporation; Bankers Trust Company, a
corporation; Rockwood National Corporation, a corporation,
and James E. Townsend, an individual, Defendants,
The Bank of New York, a corporation; Irving Trust Company,
a corporation; Sterling National Bank & Trust Company of
New York, a corporation, and Bankers Trust Company, a
corporation, Defendants-Appellees.
Stanley C. CRUDEN, Individually and on behalf of a Class of
Persons Similarly Situated; Philip Zerylnick, and
Sibalin, S.A., a corporation,
Plaintiffs-Appellants,
v.
IRVING TRUST COMPANY, a corporation; Rockwood National
Corporation, a corporation; James E. Townsend, an
individual; the Bank of New York, a corporation; Sterling
National Bank & Trust Company of New York, a corporation;
Bankers Trust Company, Defendants-Appellees.
 Nos. 1470 to 1473, 1463-1466, Dockets 91-7187, 91-7189,
91-7191, 91-7193, 91-7041, 91-7047, 91-7053 and 91-7065.
 United States Court of Appeals,
Second Circuit.
 Argued May 16, 1991.
Decided Jan. 6, 1992.
As Amended April 1, 1992.
 
 Michael P. Malakoff, Pittsburgh, Pa., (Richard A. Finberg, Berger Kapetan Malakoff & Meyers, Pittsburgh, Pa., Jules Brody, Stull, Stull & Brody, New York City, of counsel), for plaintiffs-appellants.
 Clifford Peterson (Robert L. Laufer, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendant-appellee Sterling Nat. Bank & Trust Co. of New York.
 Alfred W.J. Marks (Wallace E.J. Collins, Emmet, Marvin & Martin, New York City, of counsel), for defendants-appellees The Bank of New York and Irving Trust Co.
 David Rabinowitz (Helen Gavaris, Moses & Singer, New York City, of counsel), for defendant-appellee Bankers Trust Co.
 Linda H. Joseph (Joseph A. Podwika, Mary C. Fitzgerald, Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., of counsel), for defendants-appellees Rockwood Nat. Corp. and James E. Townsend.
 Before LUMBARD and CARDAMONE, Circuit Judges, and LASKER, District Judge.*
 CARDAMONE, Circuit Judge:
 Plaintiffs, debenture holders of a defaulted lender, appeal from January 25 and January 28, 1991 judgments of the United States District Court for the Southern District of New York (Keenan, J.) which granted summary judgment dismissing, on various grounds, plaintiffs' claims against the successor of the debentures' issuer or guarantor and the Indenture Trustees. The district court's ruling covered four separate actions arising from the same set of facts. In each, the debenture holders are suing (1) Rockwood National Corporation claiming it is liable--as successor to the issuer or guarantor, Levin-Townsend Computer Corporation (Levin-Townsend)--for payment obligations of debentures, (2) James E. Townsend, a former President of Rockwood National, and (3) the four banks who acted as Indenture Trustees for the four sets of debentures involved. Three actions brought by Stanley Cruden and Philip Zerylnick were certified as class actions pursuant to Fed.R.Civ.P. 23(b)(3), with Cruden and Zerylnick representing a class of individual debenture holders (the Cruden actions). The fourth action was brought by Sibalin, S.A., a Panamanian corporation with its principal place of business in Geneva, Switzerland, and a debenture holder (the Sibalin action). The Sibalin action involves substantially the same claims against the same defendants, but raises some distinct issues and consequently will be referred to separately when necessary.
 This opinion is necessarily long because the numerous clauses of the Indentures and the Trust Indenture Act upon which the multiple parties' rights hinge must be set forth to make this appeal intelligible. But its length should not deter the reader because--just as the daunting facade in the Wizard of Oz was stripped away revealing an ordinary man manually operating a wind machine, so here--after all the facts have been exposed what remains to be decided are two rather straightforward legal questions: whether the statute of limitations bars plaintiffs' claims against all defendants and whether defendant Trustees properly relied on the opinion of counsel. For the reasons discussed below, the judgments of the district court are affirmed, in part, reversed in part, and remanded.
 
 FACTS
 
 1
 In the late 1960's, Levin-Townsend, a New Jersey corporation, raised capital by entering into a series of Trust Indentures under which it or its subsidiary, Levin-Townsend International, Inc. (International), issued debentures to the public. The Cruden plaintiffs are holders of $2,349,600 in debentures issued by Levin-Townsend. Sibalin owns $266,000 worth of debentures issued by International. Although International was the obligor on this bond issue, payment was unconditionally guaranteed by Levin-Townsend.
 
 
 2
 Defendant Bank of New York is the Indenture Trustee for one series of these debentures designated as 5 1/4 percent Convertible Subordinated Debentures. Defendant Sterling National Bank & Trust Co. of New York (Sterling) is the Indenture Trustee for a series designated as 7 percent Convertible Senior Subordinated Debentures. Defendant Irving Trust Co. (Irving) is the Indenture Trustee for debentures designated as 5 1/2 percent Convertible Subordinated Debentures. Defendant Bankers Trust Co. (Bankers Trust) is the Indenture Trustee for the International bond issue, debentures designated as 5 percent Guaranteed Convertible Debentures. The Indenture Agreements for the Irving and the Bank of New York issues were entered into on April 15 and September 15, 1967, respectively. The Indenture Agreements for the Sterling and Bankers Trust issues were entered into on August 1, 1968. Chase Manhattan Bank originally was a party to the Sterling Indenture Agreement and was succeeded by Sterling on September 24, 1971. Each Indenture Agreement was made with Levin-Townsend, and each of the debentures was convertible into common stock of Levin-Townsend. Interest was due semi-annually over the 15 to 20 year life of the debentures. Principal was due as to the Sterling issue on August 1, 1983, and as to the other issues thereafter.
 
 
 3
 Beginning in July 1972, a series of events took place that are the centerpiece of the instant dispute. First, Levin-Townsend changed its name to Rockwood Computer Corporation (still referred to for convenience as Levin-Townsend). Second, Levin-Townsend formed two Delaware corporations: Rockwood Computer Corporation (Computer), and Rockwood National Corporation (National). Third, on August 8, 1973 pursuant to terms of an Agreement and Plan of Reorganization, Computer became a wholly-owned subsidiary of National, Levin-Townsend transferred substantially all of its assets to Computer, and Computer assumed all Levin-Townsend's debts. Further, National became the 100 percent stockholder of Computer, and Levin-Townsend shareholders received shares in National on a one-for-one basis, with no new shareholders being added.
 
 
 4
 National and Computer thereafter entered into Supplemental Indenture Agreements with each of the defendant Trustees in which the conversion and payment/guarantee obligations described in the original Indentures were split. Computer agreed to assume the obligation of paying principal and interest on the debentures issued by Levin-Townsend and to assume the role of guarantor as to the International issue; National agreed to permit the conversion of the debentures into its stock. Immediately after the August 8, 1973 reorganization was consummated, Computer's 86 percent-owned real estate subsidiary, National Equities, Inc. (NEI), was transferred to National, in exchange for a $40,946,638 non-interest-bearing promissory note. This note was never paid.
 
 
 5
 In 1976, Computer, its subsidiary International (formerly the subsidiary of Levin-Townsend), and NEI went into default for nonpayment of interest on various of the debentures. These defaults were cured by an Exchange Offer in 1978 orchestrated by National in which 73 percent of the total outstanding debentures of Computer, International and NEI were tendered. National offered cash and its own convertible income debentures due January 1993 in exchange for the debentures of these three companies, and all back interest due on the debentures not exchanged was paid in full.
 
 
 6
 On March 16, 1979 the original purchase price for the NEI stock was reduced from $41 to $7.8 million. Then, an extremely peculiar transaction took place that resulted in this debt being erased. National sold to Computer the stock of Rockwood Leasing Services, Inc. The assets of Rockwood Leasing consisted of $23.2 million in principal amount of Computer debentures obtained in the above Exchange Offer and a promissory note of Computer in the amount of $600,000. Thus, the $41 million note for National's purchase of NEI was initially deferred, then written down by 80 percent, and ultimately exchanged for Computer's own securities, which National had obtained with funds originating from Computer.
 
 
 7
 In August 1983 Computer and International defaulted on the payment of principal and interest on the Sterling and Bankers Trust issues, respectively. This forced Computer to file a voluntary bankruptcy petition, which constituted a default under the Indentures. All other debenture series shortly thereafter went into default.
 
 PROCEDURAL HISTORY
 
 8
 In June 1985 the Cruden plaintiffs filed three lawsuits in the Southern District of New York. The actions were certified as class actions on February 1, 1988. Sibalin filed its suit in July 1987. All plaintiffs are suing the Trustees for violations of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa et seq. (1988), and for breach of the Indentures. They also assert causes of action against National and Townsend for breach of the Indentures, piercing the corporate veil, common law fraud, violations of the New York Fraudulent Conveyance Act, N.Y. Debt. & Cred. § 270-281 (McKinney 1991), and for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (1988) (RICO).
 
 
 9
 Plaintiffs claim that the 1972 reorganization was part of a fraudulent scheme to siphon profits from Computer to National, leaving Computer unable to meet its obligations on the bonds, and that National dominated and controlled Computer through common officers and directors to achieve these illicit ends. Plaintiffs allege, for example, that defendants National and Townsend committed fraud through self-dealing over the six-year period from 1972-1979 during which time the $41 million non-interest-bearing promissory note given to Computer by National for the purchase of NEI was delayed, written down, and finally cancelled. They also argue that the degree of National's domination over Computer during this period justifies piercing the corporate veil.
 
 
 10
 Plaintiffs further allege that the 1972 reorganization of Levin-Townsend constituted a consolidation, merger, or sale or transfer of all or substantially all of its assets under the original Indentures and, as such, the reorganization was required to satisfy certain conditions under the Indentures, i.e., that Levin-Townsend's obligation to pay principal and interest, or in the case of the Bankers Trust issue, to act as guarantor, pursuant to the terms of the debentures be assumed by both National and Computer. Because the conversion and payment/guarantee obligations were, in fact, split, plaintiffs allege that the Supplemental Indentures violated each of the original Indentures and the Trustees therefore breached the Indentures by agreeing to the Supplemental Indentures. Plaintiffs also allege that the defendant Trustees violated the original Indentures and failed to protect debenture holders by relying upon, and negligently failing to examine, opinions of counsel issued by Simpson Thacher & Bartlett, Esqs., which stated that the above reorganization and Supplemental Indentures complied with the Indentures. In addition they contend that these opinions failed to comply with the Indentures for several reasons.
 
 
 11
 National and Townsend filed motions for summary judgment in all four actions, asserting, inter alia, the statute of limitations barred the claims against them. Defendants Sterling, Irving, and Bank of New York also moved for summary judgment based on the statute of limitations, and alternatively asserted their good faith reliance on opinions of counsel in executing the Supplemental Indentures precluded liability. Bankers Trust sought judgment on the pleadings, arguing only a statute of limitations defense. All plaintiffs thereafter cross-moved for summary judgment on the issue of liability. Sibalin's motions as to National and Townsend were later withdrawn.
 
 
 12
 In an opinion dated September 4, 1990, Judge Keenan granted defendants' motions in part. See 1990 Fed.Sec.L.Rep. p 95,466, 1990 WL 131350 (S.D.N.Y.1990). He ruled that the suits against the Trustees were governed by New York's six-year statute of limitations for breach of contract actions which he held began to run at the time of the alleged breach. Thus, the court dismissed all claims against the Trustees that accrued prior to the following dates:
 
 
 13
 Defendant Trustee Allegations viable as of
Bank of New York June 3, 1979
Sterling June 5, 1979
Irving June 12, 1979
Bankers Trust July 30, 1981
 
 
 14
 This dismissal effectively covered all plaintiffs' claims based on the Trustees' alleged pre-bankruptcy misconduct. Alternatively, the district court found that Sterling, Irving and Bank of New York had properly relied on the Simpson, Thacher opinions and were thus absolved of all potential liability for the alleged breaches.
 
 
 15
 The district court also dismissed the complaints with prejudice as against National and Townsend. It found the circumstances appropriate to disregard the corporate form in order to achieve equity, and that the evidence submitted weighed in favor of finding successor liability. Nevertheless, the trial court went on to find that plaintiffs' claims for successor liability, piercing the corporate veil, and breach of the Indentures were all based on fraud and, under the accrual rules for fraud claims, were time-barred. It ruled that the RICO and fraud claims were untimely for the same reasons. The Cruden plaintiffs' cross-motions for summary judgment on the issue of liability were therefore denied.
 
 
 16
 The district court's judgment did not affect plaintiffs' claims based on defendants' post-bankruptcy conduct, but those claims were subsequently dismissed by the district court at plaintiffs' request. Final judgments were entered accordingly on January 25 and 28, 1991.
 
 DISCUSSION
 I Claims Against The Trustees
 A. Statute of Limitations
 
 17
 Defendants Bank of New York, Sterling, and Irving moved for summary judgment, and defendant Bankers Trust moved to dismiss on the pleadings based on statute of limitations grounds. The district court held that actions against the Indenture Trustees were time-barred. Because the Trust Indenture Act does not include a statute of limitations, the court borrowed a six-year statute of limitations for breach of contract actions from New York law. See N.Y.Civ.Prac.L. & R. § 213(2) (McKinney 1991). The district court then dismissed as time-barred plaintiffs' amended complaints insofar as they related to culpable conduct by Bank of New York, Sterling, and Irving before the summer of 1979 and by Bankers Trust before the summer of 1981. We think in reaching this conclusion the district court erred.
 
 
 18
 As an initial matter, the Trustees argue that we should adopt a uniform federal statute of limitations for actions arising under the Trust Indenture Act. They contend that our opinion in Ceres Partners v. GEL Assoc., 918 F.2d 349, 360 (2d Cir.1990), in which we joined the Third and Seventh circuits in abandoning the long-standing practice of borrowing analogous state statutes of limitations for actions brought under §§ 10(b) and 14 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n (1988), supports their view that we should not look to state statutes. Instead, the Trustees urge us to borrow the one-year, three-year limitation of § 77www(a) of the Trust Indenture Act, which creates a cause of action for misleading statements filed with the SEC. This provision bars actions not brought within one year of discovery and three years after the cause of action accrued, and is found throughout the federal securities laws. See, e.g., 15 U.S.C. § 78i(e) (manipulation of securities prices); 15 U.S.C. § 78r(c) (liability for misleading statements in SEC filings); 15 U.S.C. § 78cc(b) (voidable illegal contracts). The plaintiffs here allege both breach of the Trust Indenture Act, a statutory claim, and breach of the Indentures, which are contract claims. Each of the Indentures specifically provides: "This Indenture and each Debenture shall be deemed to be a contract made under the laws of the State of New York, and for all purposes shall be construed in accordance with the laws of said State." Thus, even were we to adopt a uniform federal rule for the federal statutory cause of action, New York's six-year statute of limitations for contract claims would still apply to the state causes of action. See H. Sand & Co., Inc. v. Airtemp Corp., 934 F.2d 450, 453 (2d Cir.1991) (contract must be construed under applicable state law including state statute of limitations); see also Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir.1989).
 
 
 19
 Because the two causes of action are so intertwined, it appears prudent in this case to continue to borrow state statutes of limitations for suits arising out of indenture agreements. For the same reason, we need not decide whether the Trust Indenture Act is applicable to the debentures issued by International, which were traded in the European market. For purposes of this appeal, Sibalin's claim against Bankers Trust for violations of its Indenture can be regarded as contractual in nature only, and we refer to provisions of the Trust Indenture Act merely for illumination. We agree therefore with Judge Keenan's decision to apply New York's six-year statute of limitations both to plaintiffs' statutory and/or contract claims against the Trustees. The pivotal question we must address is when that limitations period began to run in these cases. Central to this question are the so-called "no action" clauses contained in each Indenture.
 
 B. The "No Action" Clause
 
 20
 All four of the Indentures contain what are known as "no action" clauses. The Sterling Indenture is typical:
 
 
 21
 No holder of any Debenture shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than twenty-five per cent in aggregate principal amount of the Debentures then outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee for thirty days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings....
 
 
 22
 Sterling Indenture at § 9.04 (emphasis added). These clauses are strictly construed. See Friedman v. Chesapeake & Ohio Ry. Co., 261 F.Supp. 728, 730 n. 1 (S.D.N.Y.1966) ("The quoted reference is definite and fairly places the bondholder on notice that his rights ... are restricted and conditioned by the indenture."), aff'd, 395 F.2d 663 (2d Cir.1968), cert. denied, 393 U.S. 1016, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969).
 
 
 23
 Notwithstanding the "no action" clause, the debenture holders have an absolute right to institute suit after nonpayment of principal or interest:
 
 
 24
 Notwithstanding any other provisions of this Indenture, however, the right of any holder of any Debenture to receive payment of the principal of (and premium, if any) and interest on such Debenture, on or after the respective due dates expressed in such Debenture, or to institute suit for the enforcement of any such payment on or after such respective [due] dates, shall not be impaired or affected without the consent of such holder ...
 
 
 25
 Sterling Indenture at § 9.04 (emphasis added). This provision, required by § 316 of the Trust Indenture Act, 15 U.S.C. § 77ppp(b), is contained in all four of the Indentures.
 
 
 26
 Hence, by the terms of the Indentures, the debenture holders could not bring suit "upon or with respect to" the Indenture until either (a) there was an "event of default"--defined as including nonpayment of interest or principal, breach of the Indenture, or bankruptcy of the issuer--and the debenture holders gave written notice of that event to the Trustee, and at least 25 percent in aggregate principal amount of debenture holders made a request of the Trustee to institute suit, and the holders offered the Trustee indemnity, and 30 days (or 60 days depending on the Indenture) had passed without the Trustee instituting suit, or (b) the issuer defaulted on payment of principal or interest. Because the claims against the Trustees are not for non-payment of principal or interest as such, but rather assert breaches of the Trust Indenture Act and the Indentures, alternative (b) is irrelevant in assessing when plaintiffs' causes of action against the Trustees accrued.
 
 
 27
 The district court held that the "no action" clause applied only to debenture holder suits against Levin-Townsend, not the Indenture Trustees. 1990 Fed.Sec.L.Rep. p 95,466 at 97,413. This construction of § 9.04 obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself. Nonetheless, merely because the "no action" clause does not by its terms prohibit suit against the Trustees for breach of their obligations under the Indentures does not mean that it did not operate to toll the statute of limitations upon an alleged breach having occurred. Plaintiffs' causes of action against the Trustees cannot be deemed to have accrued until the plaintiffs were entitled to a remedy, regardless of when the Trustees actually breached the Indentures, which, plaintiffs allege, occurred when the Trustees entered into the Supplemental Indentures.
 
 
 28
 Had the debenture holders sued the Trustees in 1973 when the latter executed the Supplemental Indentures, they would have had no remedy. Damages could not have been ascertained in 1973 since there was no default on principal or interest payments until 1983. Nor could the court in 1973 have fashioned equitable relief, such as rescission or reformation, without joining the issuer as an indispensable party within the meaning of Fed.R.Civ.P. 19(a)(2)(i), because the issuer properly would have "claim[ed] an interest relating to the subject of the action and [would have been] so situated that the disposition of the action in [its] absence ... as a practical matter [would have] impair[ed] or impede[d its] ability to protect that interest." Although the issuer conceivably could have been joined by the Indenture Trustees as a third party defendant under Fed.R.Civ.P. 14(a), such a joinder would have allowed the debenture holders to circumvent the "no action" clauses, upsetting settled indenture law and the expectations of countless parties to proposed or existing indenture agreements, a course we believe would have been unwise if taken then, and equally unwise today. Consequently, plaintiffs had no remedy until 1983 when there was a default in payment. Only then did plaintiffs' causes of action against the Trustees accrue. Therefore, plaintiffs' suits against the Indenture Trustees--brought well within six years of the 1983 default--are not barred by the six-year New York statute of limitations applicable to these claims and the district court erred when it concluded otherwise.
 
 
 29
 Because Bankers Trust relied solely on its argument that Sibalin's claim was untimely, the judgment entered in favor of Bankers Trust is reversed and the cause is remanded for further proceedings. Bank of New York, Sterling and Irving, however, additionally asserted the defense of proper reliance on opinion of counsel. Having concluded that the Cruden plaintiffs' claims against these defendants are timely, we now turn to address the question of whether claims premised on the Trustees' entering into the Supplemental Indenture in violation of the original Indenture are nonetheless barred because of the Trustees' reliance on the Simpson, Thacher opinion. The following discussion therefore bears directly only on the Cruden plaintiffs' claims against Bank of New York, Sterling and Irving.
 
 C. Opinions of Counsel
 
 30
 The Indenture Agreements governing the debenture issues required the issuer and the Indenture Trustees to enter into Supplemental Indentures upon the reorganization of Levin-Townsend. Pursuant to the Indentures, each of the Indenture Trustees obtained opinions of counsel from Simpson, Thacher dated August 8, 1973. The Cruden plaintiffs contend that the Simpson, Thacher opinions do not conform to the requirements of the Indentures, and hence reliance by Bank of New York, Sterling, and Irving upon those opinions cannot be asserted as a defense to claims stemming from their entering into Supplemental Indentures which violated provisions of the original Indentures.
 
 
 31
 Under the Trust Indenture Act (Act), an indenture may provide that prior to default (as defined in the indenture):
 
 
 32
 the indenture trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of such trustee, upon certificates or opinions conforming to the requirements of the indenture.
 
 
 33
 15 U.S.C. § 77ooo (a)(2) (1988) (emphasis added). The Sterling Indenture, like the Bank of New York and Irving Indentures, contains the type of provision permitted by § 77ooo (a)(2):
 
 
 34
 in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture.
 
 
 35
 Sterling Indenture at § 10.01(a)(2) (emphasis added).[1] In order to "conform to the requirements of [the] Indenture," an opinion of counsel must be
 
 
 36
 an opinion in writing signed by legal counsel, who shall be acceptable to the Trustee and who may, unless in a particular instance the Trustee shall otherwise require, be of counsel to the Company. Each such opinion shall include the statements provided for in Section 17.04, if and to the extent required by the provisions thereof.
 
 
 37
 Id. at § 1.01. The "statements provided for in Section 17.04" are required by § 77nnn(e) of the Act, and hence appear in the Sterling, Bank of New York, and Irving Indentures. They are:
 
 
 38
 1. a statement that the person making such certificate or opinion has read such covenant or condition;
 
 
 39
 2. a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;
 
 
 40
 3. a statement that, in the opinion of such person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and
 
 
 41
 4. a statement as to whether or not, in the opinion of such person, such condition or covenant has been complied with.
 
 
 42
 Plaintiffs assert that the second requirement was not satisfied because the nature and scope of Simpson, Thacher's examination were simply not stated. In addition, they contend the fourth requirement was not met because counsel's opinions failed to address the issues of debenture holder approval for the reorganization and the separation of the conversion and payment obligations between National and Computer, respectively. We address these contentions in turn.
 
 
 43
 First, the Simpson, Thacher opinions contained the requisite statement describing the nature and scope of the examination or investigation. The letter to Sterling is typical. In pertinent part it stated
 
 
 44
 we have examined the Agreement and Plan of Reorganization, the Indenture and the Supplemental Indenture, and ... such other documents, corporate records and certificates and such questions of law as we have considered necessary or appropriate....
 
 Counsel's letter continued
 
 45
 [w]e are of the opinion that we have made such examination or investigation as is necessary to enable us to express an informed opinion as to the matters set forth below.
 
 
 46
 Although these statements were brief, Simpson, Thacher advised that it had made the examination or investigation it believed necessary to render a legal opinion in this matter. These statements satisfied the first three requirements of the relevant sections of the Indentures and § 77nnn(e) of the Act.
 
 
 47
 Plaintiffs also urge that Simpson, Thacher should have passed on whether a debenture holder vote was required by § 13.02 of the Sterling Indenture (and analogous provisions in the Bank of New York and Irving Indentures). Close examination reveals that there is less to this argument than at first appears.
 
 
 48
 It is conceded that the 1973 Supplemental Indenture is governed by Article 14 of the Sterling Indenture (and similar provisions in the Bank of New York and Irving Indentures) titled "Consolidation, Merger, Sale or Transfer." That Article provides
 
 
 49
 Subject to the provisions of Section 4.05, nothing contained in this Indenture or in any of the Debentures shall prevent any consolidation or merger of the Company with or into any other corporation or corporations or successive consolidations or mergers in which the Company or its successor or successors shall be a party or parties, or shall prevent any sale or transfer of all or substantially all of the assets of the Company to any other corporation authorized to acquire and operate the same....
 
 
 50
 Sterling Indenture at § 14.01. Section 4.05 simply states that in case of a consolidation, merger, or sale of the Company, the Company or its successor shall execute a supplemental indenture providing the debenture holders with the right to convert their debentures into "the kind and amount of shares of stock" such holders could have converted their debentures into prior to the merger, sale, or consolidation. This provision is obviously designed to protect debenture holder conversion rights.
 
 
 51
 The supplemental indenture required by §§ 14.01 and 4.05 is explicitly provided for by, e.g., Article 13 of the Sterling Indenture. There are two possible ways the Company may enter into supplemental indentures pursuant to that Article. The first explicitly allows the Trustee to enter into supplemental indentures without debenture holder approval:
 
 
 52
 The Company, when authorized by a resolution of its Board of Directors, and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act of 1939 as in force at the date of the execution thereof) for one or more of the following purposes:
 
 
 53
 (a) to evidence the succession of another corporation to the Company, or successive successions, and the assumption by the successor corporation of the covenants, agreements and obligations of the Company pursuant to Article Fourteen hereof;
 
 
 54
 (b) to provide for the adjustment of conversion rights of Debenture pursuant to the requirements of Section 4.05;
 
 
 55
 ....
 
 
 56
 Any supplemental indenture authorized by the provisions of this section 13.01 may be executed by the Company and the Trustee without the consent of the holders of any of the Debentures at the time outstanding, notwithstanding any of the provisions of Section 13.02.
 
 
 57
 Sterling Indenture at § 13.01 (emphasis added). Alternatively,
 
 
 58
 [w]ith the consent of the holders of not less than sixty-six and two-thirds percent (66 2/3%) in aggregate principal amount of the Debentures at the time outstanding, the Company, when authorized by a resolution of its Board of Directors, and the Trustee may ... enter into an indenture or indentures supplemental hereto ... for the purpose of ... modifying in any manner the rights of the holders of the Debentures; provided however, that no such supplemental indentures shall ... alter or impair the right to convert the [Debentures] into Common Stock at the price and upon the terms provided in this Indenture, without the consent of the holder of each Debenture so affected....
 
 
 59
 Id. at § 13.02 (emphasis added).
 
 
 60
 Plaintiffs argue the Simpson, Thacher letters were required to address and state whether § 13.02 had been complied with. Counsel's letter to Sterling notes that "the Supplemental Indenture complies with Sections 4.05 and 14.01 of the Indenture, and the covenants of the Predecessor Company contained in Sections 4.05 and 14.01 of the Indenture have been complied with." It states further that "the Supplemental Indenture does not ... conflict with or result in a breach of the terms, conditions or provisions of ... any ... indenture ... known to us to which the Company or National is a party or by which it is bound." By clear implication, Simpson, Thacher found the Supplemental Indenture was properly entered into pursuant to § 13.01 that (a) allows for such an undertaking (as described in § 14.01), and (b) allows such an undertaking without debenture holder approval. Thus, because it concluded the Supplemental Indenture did not require debenture holder approval and was therefore governed by § 13.01, there was no need for counsel to discuss § 13.02 in its letter.
 
 
 61
 It is next asserted that the Trustees' reliance on the Simpson, Thacher opinions was unwarranted because the opinions failed to address § 17.02 of the Sterling Indenture. Section 17.02 (and similar provisions in the Bank of New York and Irving Indentures) sets forth that the Indenture binds Levin-Townsend's successors and assigns: "All the covenants, stipulations, promises and agreements in this Indenture contained by or in behalf of the Company shall bind its successors and assigns, whether so expressed or not." There are no covenants to be complied with in this section. The provision operates "whether so expressed or not" in the Supplemental Indentures. An opinion of counsel, on the other hand, need only address "compliance with a condition or covenant provided for in [the] Indenture." Thus, omission of any reference to § 17.02 did not render the opinions of counsel unworthy of reliance.
 
 
 62
 Similarly meritless is the insistence that Simpson, Thacher failed to address the requirement in § 4.01 of all three Indentures that Levin-Townsend's successor honor the debenture holders' conversion rights. A review of § 4.01 of the Indentures shows that such a provision does not exist. Rather, it is § 4.05 that addresses conversion rights in the event of the merger, consolidation or sale of Levin-Townsend. As already discussed, the Simpson, Thacher opinions specifically note that § 4.05 has been complied with.
 
 
 63
 Consequently, the opinions conform to the requirements in the Indentures. Although the plaintiffs also maintain there is a lack of evidence that the Trustees examined and relied upon the opinions in good faith, there is no evidence in the record to support such an assertion. A genuine issue of fact requiring a trial cannot be raised by arguments or statements unsupported by sworn statements by persons with personal knowledge. See Beyah v. Coughlin, 789 F.2d 986, 989-90 (2d Cir.1986). Judge Keenan observed that there was a studied approach to the opinions, and that the Trustees and Simpson, Thacher corresponded about them, reflecting discussion and work between them. Nor is the Trustees' good faith put in question merely by virtue of the fact that the opinion relied upon may have been wrong; to so hold would eviscerate the opinion of counsel defense. Moreover, the record discloses nothing beyond the "incorrectness" of counsel's opinion to support an inference that the Trustees' reliance was not in good faith. There is nothing, for example, to indicate that the Trustees went "lawyer shopping" in an attempt to secure a favorable opinion of counsel. Were this to be the case, the considerations affecting our disposition might be different. But our task is simply to decide the matter before us.
 
 
 64
 For these reasons, the district court properly granted summary judgment as to any claims premised upon entering into the Supplemental Indentures in violation of the original Indentures in favor of defendants Sterling, the Bank of New York, and Irving because of their good faith reliance on opinions of counsel.
 
 D. Attorney Client Privilege
 
 65
 Discovery in the trial court was limited to the Trustees' reliance on the opinions of Simpson, Thacher. Discovery was not permitted with respect to advice of the Trustees' in-house and retained counsel. Plaintiffs claim that they should have been able to discover all legal advice on which the Trustees relied to ascertain whether they reasonably relied in good faith on the Simpson, Thacher opinions.
 
 
 66
 A trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion. See Robertson v. National Basketball Ass'n, 622 F.2d 34, 35-36 (2d Cir.1980); Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir.1975). While the Trustees arguably waived the attorney-client privilege by asserting their good faith defense, the district court's ruling was not an abuse of discretion. Assertion of this defense waived the privilege regarding only the advice of Simpson Thacher, upon which the Trustees claimed reliance. In the absence of any evidence (other than the allegedly erroneous opinion of Simpson, Thacher) tending to show bad faith, thereof, plaintiffs' request for further discovery concerning such advice was properly denied.
 
 
 67
 II Claims Against Rockwood National and Townsend
 
 
 68
 Both Sibalin's and the Cruden plaintiffs' complaints allege claims against Rockwood National and Townsend on several grounds; COUNT III against National, as successor, for breach of the Indenture; COUNT IV against National, as successor, for payment of principal and interest; COUNT V against National for fraud; COUNT VI against Townsend for fraud based on self-dealing; COUNTS VII and VIII against Townsend and National for RICO violations; COUNT IX against National for piercing the corporate veil based on fraud. National and Townsend, in their summary judgment motions, argued, inter alia, that these claims were barred by the statute of limitations.
 
 
 69
 The district court ruled that all of plaintiffs' claims were time-barred. It (a) calculated the accrual date for statute of limitations purposes as to the fraud claims from the date of certain allegedly fraudulent transfers from Computer to National occurring during the 1970's, (b) held that the causes of action for breach of the Indenture accrued when the Supplemental Indentures were executed in 1973, (c) held that plaintiffs' piercing the corporate veil and successor liability claims were based on the fraudulent transfers, and (d) dismissed plaintiffs' RICO claims as time-barred based upon our holding in Bankers Trust Co. v. Rhoades, 859 F.2d 1096 (2d Cir.1988), certs. denied, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). We discuss each of these rulings in turn.
 
 A. Fraud Claims Against National & Townsend
 
 70
 The first challenge is to the dismissal of the fraud claims against National and Townsend (Counts V & VI). We think New York law was correctly applied. The statute of limitations for fraud in New York is the longer of either six years from when the cause of action accrued or two years from the time plaintiff discovered the fraud or could have with reasonable diligence discovered it. N.Y.Civ.Prac.L. & R. §§ 203(f), 213(8) (McKinney 1991); see also Stull v. Bayard, 561 F.2d 429, 432 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978); Quadrozzi Concrete Corp. v. Mastroianni, 56 A.D.2d 353, 355-56, 392 N.Y.S.2d 687 (2d Dep't 1977).
 
 
 71
 To determine when the fraud was or should have been discovered, New York courts apply an objective test. If the circumstances of the alleged fraud would "suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises...." Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir.1983) (quoting Higgins v. Crouse, 147 N.Y. 411, 416, 42 N.E. 6 (1895)). When a plaintiff "shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." Id.
 
 
 72
 The following fraudulent transactions are here alleged to have occurred:
 
 
 73
 1) the August 8, 1973 reorganization;
 
 
 74
 2) The August 8, 1973 purchase by National from Computer of 86 percent of the outstanding stock of NEI for a $41 million Note;
 
 
 75
 3) The 1978 Exchange Offer;
 
 
 76
 4) The 1979 downward adjustment to the 1973 purchase price of NEI stock from $41 million to $7 million, which was completed on March 16, 1979. [Joint Appendix at 493a].
 
 
 77
 There was ample evidence that all plaintiffs had actual or constructive notice of each of these events.
 
 1. Notice to the Cruden Plaintiffs
 
 78
 The terms of the 1973 Reorganization were disclosed on the 10-K forms of Computer and National for the years 1973-76 and in the following: the Exchange Offer Prospectus dated July 13, 1977; a letter sent to debenture holders dated June 27, 1973; a notice to debenture holders dated August 1973; a letter sent to debenture holders dated August 1, 1979; and various newspaper articles. The terms of the sale of Computer's NEI stock to National in August 1973 were disclosed in the Form 10-K's of Computer and National for the same years and in the 1977 Exchange Offer Prospectus. The NEI stock sale was also described in the August 1, 1979 letter from Computer to debenture holders.
 
 
 79
 The Exchange Offer terms were set forth in the Exchange Offer Prospectus and in the Form 10-K's of Computer and National for the years 1977-1979. In addition, the terms of the Exchange Offer were described in a July 14, 1977 article in The Wall Street Journal and a November 1, 1977 article in the New York Times. The 1979 reduction of the purchase price of NEI stock was described in National's Form 10-K for 1979 and the August 1, 1979 letter. In addition, Computer had entirely written off the $41 million promissory note from its publicly disclosed financial statements, stating that it was uncollectible.
 
 2. Notice to Sibalin
 
 80
 Because Sibalin's debentures were in bearer rather than registered form, Sibalin did not receive the 1973 letter and notice concerning the reorganization, nor did it receive the 1979 letter disclosing the reduction of the purchase price of NEI stock. Notice as to the debentures Sibalin held must be made, according to the Bankers Trust Indenture, by legal publication in three newspapers of general circulation in London, Brussels and New York.
 
 
 81
 Sibalin concedes that the first notice it received that a wrong may have been committed arose when its interest payments stopped in 1976. Further, notice was given of Computer's default five times in the period from January 1976 until April 1978 in The Wall Street Journal, The Financial Times, The Luxembourg Wort, Finanz and Wirtschaft, and Agence Economique Et Financiere. These disclosures were in addition to the public filings by National and Computer.
 
 3. Accrual
 
 82
 Despite this overwhelming evidence that all plaintiffs knew of the alleged fraud more than two years prior to filing suit, they assert that their fraud claims are timely. Plaintiffs contend that, because they were not injured by the alleged fraud until 1983 when Computer and International defaulted on payments of debenture interest and principal, they are entitled to have the statute tolled until that time. The alternative six-year period begins to run not upon a plaintiff's having suffered an "injury" as that term seems to be used by plaintiffs, but when a plaintiff suffers a loss as a result of the defendant's fraudulent act. See Stull, 561 F.2d at 432. One suffers a "loss" so as to trigger this six-year period "when a plaintiff with assumed knowledge of the fraudulent wrong may assert a claim for relief." Id. And although, as discussed below, the plaintiffs could not have asserted a claim for relief against the issuer for breach of the debentures' payment obligations until default, they could have sued (as per the "no action clause") for appropriate legal or equitable relief for the tort of fraudulent conveyance.
 
 
 83
 New York law provides, "Where a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not matured he may proceed in a court of competent jurisdiction against any person whom he could have proceeded had his claim matured...." N.Y.Debt. & Cred. § 279 (McKinney 1991). A debenture holder is not required to stand by helplessly until a distant maturity date arrives while his debtor is fraudulently depleted of all its assets. See In re Assoc. Gas & Elec. Co., 61 F.Supp. 11, 44 n. 3 (S.D.N.Y.1944), aff'd, 149 F.2d 996 (2d Cir.) (A. Hand, J.), certs. denied sub nom. Elias v. Clarke et al., 326 U.S. 736, 66 S.Ct. 45, 90 L.Ed. 439 (1945); cf. Ettlinger v. Persian Rug & Carpet Co., 142 N.Y. 189, 192-93, 36 N.E. 1055 (1894) (bondholder may bring equitable action to foreclose mortgage without first seeking appointment of new trustee after original trustee became incompetent). It seems clear therefore that plaintiffs' cause of action for fraud accrued no later than March 16, 1979 when the purchase price for NEI stock was adjusted, and the dismissal of all claims not filed within six years of this event was proper.
 
 
 84
 B. Plaintiffs' Contractual Claims Against National
 
 
 85
 All of plaintiffs' claims--including contract claims--were held to be time-barred. Based on plaintiffs' allegations, the district court believed each of plaintiffs' theories as to liability rested on allegations of fraud in the formation of corporations that are separate entities in name only. 1990 Fed.Sec.L.Rep. p 95,466 at 97,417. This assumption led it to apply the accrual date for fraudulent transfers to plaintiffs' contract claims, and to dismiss them as untimely as well. Because the assumption was flawed, the wrong conclusion followed.
 
 
 86
 Count III of the Sibalin amended complaint (and the other amended complaints contain similar allegations) states that this claim is one "arising under the indenture" and defendant "breached the indentures." This language clearly signalled a contract cause of action, which the district court mistakenly viewed as an allegation "of fraud in the formation of corporations which are separate entities by name alone." Since we believe Count III states a contract claim for breach of the Indenture, it must be analyzed as such.
 
 1. The Statute of Limitations
 
 87
 As just discussed in reference to the applicable statute of limitations for suits against the Trustees, there is a six-year statute of limitations applicable to suits based on alleged breach of the Indentures. See N.Y.Civ.Prac.L. & R. § 213(2) (McKinney 1991). On the subject of accrual, each of the Indentures contains a so-called "no action" clause that proscribes suit by debenture holders against the issuer unless the Trustee is given written notice of default (as defined in the Indenture), 25 percent in aggregate principal amount holders serve a written request for suit upon the Trustee, the holders offer to indemnify the Trustee for litigation expenses, and the Trustee takes no action for 30 (or 60) days. Alternatively--and regardless of compliance with these terms--debenture holders may sue the issuer for breach of the Indentures once there has been a default in payment of principal or interest.
 
 
 88
 Thus, just as with plaintiffs' claims against the Trustees for breaches of the Indentures, the statute of limitations for actions against the issuer because of failure to pay principal or interest did not begin to run until August 1983 when Computer and International defaulted. Under New York law, the six-year limitations period for these actions brought on the Indentures did not expire until August 1989. The actions brought in 1985 by the Cruden plaintiffs and in 1987 by Sibalin are therefore timely insofar as they allege National breached the Indentures by failing to pay principal or interest when due, and it was error to dismiss them as time-barred.
 
 2. Liability for Breach of the Indenture
 
 89
 National moved for summary judgment dismissing these claims as time-barred. All plaintiffs cross-moved for summary judgment on the issue of liability for breach of the Indentures, though Sibalin's motion was later withdrawn. The district court disposed of these motions for summary judgment ruling for National in all instances. Therefore, although the parties do not raise the issue on appeal, the issue of liability for breach of the Indentures is properly before us with respect to the Cruden plaintiffs. See International Longshoremen's Ass'n, AFL-CIO v. Seatrain Lines, Inc., 326 F.2d 916, 920-21 (2d Cir.1964); First Nat. Bank in Yonkers v. Maryland Cas. Co., 290 F.2d 246, 251 (2d Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); see also United States Trust Co. of New York v. Executive Life Ins. Co., 602 F.Supp. 930, 936 (S.D.N.Y.1984), aff'd, 791 F.2d 10 (2d Cir.1986) (interpretation of indentures "ordinarily well-suited for a motion for summary judgment").
 
 
 90
 In deciding whether to grant summary judgment all inferences drawn from the materials submitted to the trial court are viewed in a light most favorable to the party opposing the motion. The nonmovant's allegations are taken as true and it receives the benefit of the doubt when its assertions conflict with those of the movant. See Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir.1991); Burtnieks v. City of New York, 716 F.2d 982, 985-86 (2d Cir.1983). Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted. H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc., 879 F.2d 1005, 1011 (2d Cir.1989).
 
 
 91
 Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed. See Breed v. Insurance Co. of North America, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument. See Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979). A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, Fiore v. Fiore, 46 N.Y.2d 971, 973, 415 N.Y.S.2d 826, 389 N.E.2d 138 (1979), nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case. See DeVanzo v. Newark Ins. Co., 44 A.D.2d 39, 43, 353 N.Y.S.2d 29 (2d Dep't 1974), aff'd, 37 N.Y.2d 733, 374 N.Y.S.2d 619, 337 N.E.2d 131 (1975). Further, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency. See Laba v. Carey, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (1971); National Conversion Corp. v. Cedar Bldg. Corp., 23 N.Y.2d 621, 625, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969). With these principles in mind we turn to the facts of this case.
 
 
 92
 In 1972 Levin-Townsend formed two corporations: Computer and National. Upon consummation of the reorganization on August 8, 1973 Computer became a wholly-owned subsidiary of National. Former Levin-Townsend shareholders received shares of National common stock in exchange for their shares in Levin-Townsend. Under the terms of the Supplemental Indentures entered into shortly thereafter, Computer assumed Levin-Townsend's payment obligations under the Bank of New York, Sterling, and Irving debentures, and Levin-Townsend's guarantee obligations under the Bankers Trust debentures, but National explicitly assumed only the conversion obligations, that is, the former Levin-Townsend and International debentures became convertible only into National's stock.
 
 
 93
 Under Article 1, § 1.01 of the Indentures, the term "Company" is defined as "Levin-Townsend Computer Corporation, and, subject to the provisions of Article Fourteen, ... its successors and assigns." The Indentures only allowed the "Company" to assume conversion liability of Levin-Townsend. The Sterling Indenture, typical of all, provides:
 
 
 94
 Subject to and upon compliance with the provisions of Section 2.05, and this Article Four, at the option of the holder thereof, any Debenture ... may, at any time before the close of business on August 1, 1983, ... be converted at the principal amount thereof ... into fully-paid and non-assessable shares (calculated as to each conversion to the nearest 1/100th of a share) of Common Stock, at the conversion price, determined as hereinafter provided, in effect at the time of conversion.
 
 
 95
 Sterling Indenture at § 4.01 (emphasis added). The "Common Stock" is precisely defined in the Indentures. It is the common stock of the "Company":
 
 
 96
 The term "Common Stock", when used with reference to stock of the Company, shall mean (i) the class of stock which, at the date of execution of this Indenture as originally executed, is designated as common stock of the Company and stock of any other class or classes into which such common stock or any such other class may thereafter be changed or reclassified ... provided, however, that, subject to the provisions of § 4.05, shares issuable on conversion of Debentures shall include only "Common Stock" of the Company as defined in clause (i) above.
 
 
 97
 Sterling Indenture at § 1.01 (emphasis added). Thus, the debentures issued by Levin-Townsend and International could only be converted into the common stock of the "Company," and the "Company" is defined to include Levin-Townsend and its successors. National--by virtue of its having assumed the conversion obligations--became a successor to Levin-Townsend. Cf. Broad v. Rockwell Int'l Corp., 642 F.2d 929, 946-56 (5th Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (court must interpret unambiguous indenture provisions governing conversion rights).
 
 
 98
 Pursuant to § 17.02 of the Sterling Indenture--and similar provisions of the Bank of New York, Irving, and Bankers Trust Indentures--all covenants, stipulations, promises, and agreements in the Indentures are binding on successors and assigns of Levin-Townsend, whether so expressed or not. Therefore, National, as Levin-Townsend's successor, is liable for Levin-Townsend's payment obligations under the Bank of New York, Irving, and Sterling Indentures. And National is liable for breach of the payment obligations under these Indentures that occurred beginning in August 1983. The same reasoning compels the conclusion that National is liable as a successor of Levin-Townsend for Levin-Townsend's guarantee of the Bankers Trust bond issue.
 
 
 99
 As the Cruden plaintiffs sought in their cross-motion only a judgment as to liability, we must remand the case to the district court for a trial on damages. Because Sibalin withdrew its motion for summary judgment on the issue of National's successor liability due to its assumption of Levin-Townsend's conversion obligation under the Bankers Trust issue, this portion of the case must also be remanded in order to allow Sibalin an opportunity to renew its motion and then proceed to trial on the issue of damages.
 
 
 100
 C. Plaintiffs' Claims for Piercing the Corporate Veil
 
 
 101
 Because we have already found that National is the successor (within the meaning of the Indentures) to Levin-Townsend by virtue of its having assumed Levin-Townsend's conversion obligations, a consideration of plaintiffs' alternative claims for piercing the corporate veil and successor liability under general corporate law principles is unnecessary.
 
 
 102
 D. Plaintiffs' RICO Claims Against Townsend and National
 
 
 103
 Counts VII & VIII of plaintiffs' complaints allege RICO violations against Townsend and National. The district court dismissed these claims as time barred, finding they rested on the same fraudulent transfers which underlie the fraud causes of action asserted in Counts V and VI.
 
 
 104
 In Bankers Trust, we held that as an element of proof in civil RICO claims brought under 18 U.S.C. § 1964(c), a plaintiff must show he has been "injured in his business or property" by reason of a violation of 18 U.S.C. § 1962. 859 F.2d at 1102. "Until such injury occurs, there is no right to sue for damages under § 1964(c), and until there is a right to sue under § 1964(c), a civil RICO action cannot be held to have accrued." Id. (citing Sedima v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)).
 
 
 105
 The type of injury required under § 1964(c) cannot be said to have occurred where the damages arising from defendant's conduct are "speculative or their amount and nature unprovable." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). In such cases, a refusal to award future damages as speculative is simply another way of ruling the only cause of action that has accrued is one for those damages already suffered. Causes of action for future damages become viable, i.e., accrue, when the damages actually occur.
 
 
 106
 Bankers Trust, recognizing that RICO violations may result in multiple injuries over time, adopted a rule of separate accrual. 859 F.2d at 1104-05. Consequently, "each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred." Id. at 1105. Once the cause of action accrues, a uniform four-year statute of limitations begins to run anew regardless of when the first overt act causing damage may have occurred. Id. at 1104-05.
 
 
 107
 Plaintiffs were injured within the meaning of § 1964(c) when Computer and International defaulted in 1983. Hence, regardless of when other RICO violations may have occurred, plaintiffs' RICO cause of action accrued at the time of default, and the four-year statute of limitations began to run on the action at that time. Defendants argue that plaintiffs' injury occurred at the time of the alleged fraudulent transfers. We are unpersuaded by this argument. Prior to Computer's and International's defaults in 1983, the particular injury was speculative and consequently not remediable under § 1964(c). See id. at 1103; see also Zenith Radio Corp., 401 U.S. at 339, 91 S.Ct. at 806. Unlike defendants' fraudulent actions which gave rise to claims for relief under theories of common law fraud or New York's Debtor-Creditor Law when engaged in or discovered, see supra, at 29-30, defendants' RICO violations did not give rise to a claim for relief under § 1964(c) until those violations resulted in an injury to plaintiffs' business or property--when Computer and International defaulted on their principal and/or interest payments. All plaintiffs filed their complaints within four years of these defaults. Consequently, the district court erred in dismissing plaintiffs' RICO claims against Townsend and National as untimely.
 
 CONCLUSION
 
 108
 The judgment dismissing plaintiffs' pre-bankruptcy claims against the Trustees as time-barred is reversed. The judgment dismissing, on alternative grounds, plaintiffs' claims concerning the 1978 Exchange Offer, the misleading nature of the debenture certificates, Computer's failure to fulfill sinking fund obligations, and the Trustees' failure to make and file annual reports with the Securities and Exchange Commission, is affirmed. See 1990 Fed.Sec.L.Rep. p 95,466 at 97,415. Plaintiffs' claims with respect to the Trustees' post-bankruptcy conduct, see id. at 97,413-14, have been abandoned. The Cruden plaintiffs' pre-bankruptcy claims against defendants Sterling, Bank of New York and Irving, premised upon matters as to which we have found a "statement" or "opinion" was expressed by counsel that satisfied the requirements of the Indentures and the Act, are barred because of good faith reliance. Remaining claims against the Trustees, the merits of which were not addressed by the district court, are remanded for further proceedings consistent with this opinion.
 
 
 109
 National, as the contractual successor to Levin-Townsend, is liable for breaches of the Indentures' payment obligations that occurred beginning in 1983. On remand the district court should hold a trial, if necessary, on the issue of damages to the Cruden plaintiffs arising from those breaches. Sibalin's motion for summary judgment is to be reinstated with respect to National's liability as Levin-Townsend's successor and this aspect of the case should then proceed to trial, if necessary, on the issue of damages. Because of our holding that National is liable as Levin-Townsend's contractual successor for failure to pay principal and interest, the grant of summary judgment in favor of National dismissing plaintiffs' successor liability and piercing claims is vacated as moot.
 
 
 110
 The grant of summary judgment in favor of National and Townsend dismissing plaintiffs' civil RICO claims as time-barred is also reversed, and this aspect of the case is remanded for further proceedings consistent with this opinion.
 
 
 111
 In all other respects the district court's judgments are affirmed.
 
 
 
 *
 Hon. Morris E. Lasker, Senior Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 § 77ooo was amended in 1990. See Pub.L. 101-550, Title IV, § 414, Nov. 15, 1990, 104 Stat. 2730. A provision in an indenture allowing a trustee to conclusively rely on an opinion of counsel now is automatically deemed to be provided for in an indenture, unless the indenture expressly excludes such a provision. 15 U.S.C. § 77ooo (a) (1990)