21-2023-cv
*FAT Brands Inc. v. Ramjeet et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2022

ARGUED: OCTOBER 27, 2022
DECIDED: JULY 25, 2023

No. 21-2023-cv

FAT BRANDS INC.,
*Plaintiff-Appellant,*

*v.*

WESLEY RAMJEET, SJ GLOBAL INVESTMENTS WORLDWIDE, LTD., SJ
GLOBAL INVESTMENTS, LTD., PETER SAMUEL, NEIL WALSH, KRISTINA
FIELDS, MICKEY EDISON,
*Defendants-Appellees,*

ROYAL GULF CAPITAL CORPORATION, KARL DOUGLAS, ONUR
TATLIADIM, PPMT CAPITAL ADVISORS, LTD.,
*Defendants.*

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, LEE, and ROBINSON, *Circuit Judges.*

————

This appeal stems from a failed financing deal. As alleged, the defendants engaged in a conspiracy to defraud Plaintiff-Appellant FAT Brands Inc. by misleading it as to the source and certainty of deal funding. On appeal, FAT Brands Inc. argues that the district court (Furman, *J.*) erred by dismissing claims against Defendants-Appellees Kristina Fields and Mickey Edison for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); claims against Defendants-Appellees SJ Global Investments Worldwide, Ltd., SJ Global Investments, Ltd., Peter Samuel, and Neil Walsh for failure to state a claim pursuant to Rule 12(b)(6); and separate claims against Defendant-Appellee Wesley Ramjeet for failure to state a claim.

For the reasons that follow, we VACATE in part and AFFIRM in part the district court's decision, and REMAND for proceedings consistent with this opinion.

————

> RUSSELL L. BOGART (Stuart Kagen, *on the brief*), Kagen Caspersen & Bogart PLLC, New York, NY, *for Plaintiff-Appellant* FAT Brands Inc.
>
> STUART L. MELNICK, Law Offices Stuart L. Melnick, LLC, New York, NY, *for Defendant-Appellee* Wesley Ramjeet.
>
> SARAH T. HADDAD, Pendulum Legal, New York, NY, *for Defendant-Appellee* Mickey Edison.
>
> NEIL WALSH, *pro se*, *for Defendant-Appellee* Neil Walsh.

*Defendants-Appellees* SJ Global Investments Worldwide, Ltd., SJ Global Investments, Ltd., and Samuel Fields were unrepresented.

————

JOHN M. WALKER, JR., *Circuit Judge*:

This appeal stems from a failed financing deal. As alleged, the defendants engaged in a conspiracy to defraud Plaintiff-Appellant FAT Brands Inc. by misleading it as to the source and certainty of deal funding. On appeal, FAT Brands Inc. argues that the district court (Furman, *J.*) erred by dismissing claims against Defendants-Appellees Kristina Fields and Mickey Edison for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); claims against Defendants-Appellees SJ Global Investments Worldwide, Ltd., SJ Global Investments, Ltd., Peter Samuel, and Neil Walsh for failure to state a claim pursuant to Rule 12(b)(6); and separate claims against Defendant-Appellee Wesley Ramjeet for failure to state a claim.

For the reasons that follow, we VACATE in part and AFFIRM in part the district court's decision, and REMAND for proceedings consistent with this opinion.

## BACKGROUND

Plaintiff-Appellant FAT Brands is a United States-based restaurant franchiser with over 400 locations worldwide.[1] It brought

---

[1] Unless otherwise noted, the following facts are drawn from the allegations contained in or incorporated by the amended complaint, which we accept as true for the purposes of this appeal. *See Noto v. 22nd Century*

this suit alleging that the defendants defrauded it when they promised to arrange a loan and equity investment that never materialized.

During the relevant period, Defendant Karl Douglas was the managing partner and chief investment officer (CIO) of PPMT Capital Advisors, Ltd. (PPMT), a New York corporation that represented itself as a successful money manager for investors in the Middle East and Asia. PPMT is one of over a dozen related entities bearing the PPMT moniker. Defendant-Appellee Wesley Ramjeet served as CEO of each of these entities except for PPMT itself, for which he was CFO and treasurer.

In July 2018, after learning that FAT Brands had recently sought financing, Douglas approached the company with an offer to arrange a substantial loan. Douglas told FAT Brands that he represented the Qatari royal family, which, he said, would fund the loan through its investment entity Royal Gulf Capital Corp. (Royal Gulf).[2] These were lies. Douglas did not represent the Qatari royal family, and Royal Gulf was a New York corporation controlled by Douglas without the capital to fund the deal.

The next month, PPMT and FAT Brands signed a letter of intent setting out a complex transaction through which Royal Gulf would lend FAT Brands up to $60 million. FAT Brands paid PPMT a $100,000 due diligence fee and provided PPMT with confidential

---

*Grp., Inc.*, 35 F.4th 95, 99 (2d Cir. 2022).

[2] When we use the term "PPMT Defendants," we are referring to Douglas, PPMT, and Royal Gulf collectively.

financial information. Relying on Douglas's assurances that the Qatari royal family was committed to the transaction, FAT Brands advised its existing lenders and investors about the pending deal.

The parties agreed to close the deal in December 2018. FAT Brands and PPMT signed the necessary agreements on December 20, 2018, but PPMT never transferred the funds.

The truth was that neither the Qatari royal family nor any of its entities had agreed to fund the transaction. Instead, Douglas had been secretly negotiating for funding from Defendant-Appellee SJ Global Investments Worldwide, Ltd. (SJ Global WW). SJ Global WW, a British corporation, represented itself as the private equity arm of the $50 billion "SJ Global Trust." Defendant-Appellee Kristina Fields, who is not a U.S. citizen, served as SJ Global WW's CFO and as a director. Defendant-Appellee Mickey Edison, who resides in Switzerland, was represented as a trustee of the SJ Global Trust. Defendant-Appellee Neil Walsh was a part owner and the managing director of SJ Global WW, and Defendant-Appellee Peter Samuel was a part owner and director of SJ Global WW and represented himself as chairman of the SJ Global Trust.[3]

In the fall of 2018, unbeknownst to FAT Brands, PPMT and SJ Global WW formed a partnership through which SJ Global WW would invest in deals arranged by PPMT. The partners created several new entities through which SJ Global WW would finance FAT Brands with a loan and equity investment. Most relevant here, the

---

[3] Where appropriate, we refer to the SJ Global family of companies and its principals as "SJ Global Defendants."

partners created PPMT Fund I LP and Defendant-Appellee SJ Global Investments, Ltd. (SJ Global US). SJ Global US was to serve as SJ Global WW's remittance agent, effectuating the transfer of funds from SJ Global WW to PPMT Fund I LP, the entity that signed the credit agreement with FAT Brands. FAT Brands was told nothing of SJ Global WW's involvement in the transaction, but was instructed to list PPMT Fund I LP as the counterparty in the credit agreement.

Finally, in January 2019, after repeated delays in funding the transaction, Douglas disclosed to FAT Brands that SJ Global WW would be the true source of the promised funds. Later that month, FAT Brands CEO Andrew Wiederhorn met in Zurich with Douglas and SJ Global WW's Samuel, Walsh, and Edison. "During the meeting, SJ Global [falsely] claimed that it had never committed in writing or otherwise to PPMT to invest in FAT through its PPMT Fund. SJ Global further claimed that it did not approve of the deal's structure and would be interested instead in a 'direct deal' with FAT." App'x 150.

After the meeting, SJ Global WW acceded to FAT Brands's demand for proof that it had the means to fund the transaction. SJ Global WW's CFO, Fields, sent FAT Brands a receipt purporting to show that SJ Global WW held $19 billion in thirty-eight $500 million Federal Reserve bearer bonds. She represented to FAT Brands that these bonds were only a fraction of the firm's total assets under management. FAT Brands quickly determined that the receipt was a forgery and Fields's boast a lie. The deal fell apart.

In November 2019, FAT Brands filed this action in the Southern District of New York. It brought two claims against the SJ Global

Defendants, one for fraud and conspiracy to commit fraud (Count IV) and another for tortious interference with contract (Count VII). It also advanced three claims against Ramjeet for liability under a partnership agreement with Douglas (Count IX), negligent supervision (Count X), and apparent authority (Count XI). Last, it brought fraud and contract claims against the PPMT Defendants, which included Douglas, all of which have been resolved and are not at issue in this appeal.

Fields and Edison moved to dismiss on the grounds that they lacked sufficient contacts with New York State to subject them to the court's jurisdiction, and both the SJ Global Defendants and Ramjeet moved to dismiss for failure to state a claim. The district court granted the motions and dismissed all remaining claims.

This appeal followed. FAT Brands asks this court to reverse the district court's order dismissing Count IV for fraud and conspiracy to commit fraud against the SJ Global Defendants. Specifically, it argues that the district court erred by determining that it lacked jurisdiction over Fields and Edison, and that the district court erred by holding that the amended complaint fails to state a claim against the remaining SJ Global Defendants. FAT Brands also asks this court to reverse the district court's order dismissing Counts IX and X against Ramjeet for liability under a partnership agreement with Douglas and for negligent supervision, respectively.

## DISCUSSION

"We review the grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Fink v. Time Warner Cable*, 714 F.3d

7

739, 740–41 (2d Cir. 2013) (per curiam).  "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."  *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).  Specifically with respect to personal jurisdiction, we review the district court's decision "for clear error on factual holdings and *de novo* on legal conclusions."  *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir. 2001).  We review a dismissal pursuant to Rule 12(b)(6) to determine whether a complaint contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

I.     **Whether the District Court Has Personal Jurisdiction Over Fields and Edison**

FAT Brands appeals the district court's order dismissing Count IV against Fields and Edison for lack of personal jurisdiction.  It argues that the district court erred when it failed to consider whether it had jurisdiction over the pair under its conspiracy-based theory of jurisdiction.  We agree.  Upon considering this theory, we hold that the district court has jurisdiction over both Fields and Edison because the jurisdictional contacts of their co-conspirators may be imputed to them.

In diversity cases such as this one, personal jurisdiction is governed by the law of the forum state and is limited by federal due process requirements.  *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  Applicable here, New York's long-arm statute provides for personal jurisdiction over a non-domiciliary who, *inter*

*alia*, "commits a tortious act within the state" personally "or through an agent." N.Y. C.P.L.R. § 302(a)(2). We have recognized that New York law defines "agent" broadly for purposes of personal jurisdiction, explaining that "an agency relationship will be held to exist under section 302(a)(2)" provided "a showing [is] . . . made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981). Thus, "'agent' . . . include[s] not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators." *Chrysler Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) (collecting cases); *accord Berkshire Bank v. Lloyds Banking Grp. plc*, No. 20-1987-CV, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (summary order), *cert. denied*, No. 21-1503, 2022 WL 4657220 (U.S. Oct. 3, 2022) (noting that "New York courts have long recognized [that] allegations of a conspiracy can satisfy [§ 302(a)(2)] and a co-conspirator can be considered an agent so that '[t]he acts of a co-conspirator may . . . be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant'" (quoting *Reeves v. Phillips*, 388 N.Y.S.2d 294, 296 (N.Y. App. Div. 1976))).

To establish personal jurisdiction over a co-conspirator under an agency theory of jurisdiction, a plaintiff must allege: first, that the defendant was "a part of a conspiracy involving . . . overt . . . acts in New York," *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 7 (N.Y. App. Div. 2013); and, second, that:

> (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state

9

conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, *or* at the request of or on behalf of the out-of-state defendant.

*Berkshire Bank*, 2022 WL 569819, at *3 (quoting *Lawati*, 961 N.Y.S.2d at 7).  FAT Brands's amended complaint meets these requirements.

### A.    Conspiracy

FAT Brands plausibly alleges that Fields and Edison participated in a conspiracy that involved overt acts in New York.  The amended complaint states that the defendants undertook to defraud FAT Brands, identifies several in-state overt acts that furthered the conspiracy—including a September 2018 meeting between FAT Brands and PPMT at PPMT's New York office—and details FAT Brands's resulting losses.  *See Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986) (setting out the elements of a conspiracy).

The amended complaint specifically alleges that Fields joined and actively participated in the conspiracy.  Most significant is the complaint's allegation that, after meeting with FAT Brands in Zurich, Fields sent FAT Brands a forged receipt as proof that SJ Global WW could fund the deal.  The "receipt" she furnished indicated that SJ Global WW held $19 billion of Federal Reserve bearer bonds.  Fields also promised FAT Brands that these bonds were "just a taster." App'x 150.  FAT Brands persuasively shows that the receipt was a forgery and Fields's representation dishonest.  This conduct was, FAT Brands alleges, in furtherance of the broader scheme to defraud it. The amended complaint alleges that Fields participated in the conspiracy in other ways as well, including by "advis[ing] Walsh on

the structuring of the deals and the negotiations with PPMT and FAT Brands." App'x 161.

FAT Brands similarly alleges that Edison "played an integral role" in the conspiracy. App'x 161. Specifically, Edison "issued false representations directly to FAT and PPMT," advised other SJ Global Defendants on the FAT Brands deal, and "encouraged, solicited and participated in the other SJ Global Defendants issuing false representations to FAT and PPMT regarding the bona fides of SJ Global . . . along with proffering patently false excuses for the repeated delaying of the closing of the transaction." App'x 161–62.

**B.      Awareness, Benefit, and Direction or Control**

Having determined that FAT Brands plausibly alleges a conspiracy in which both Fields and Edison joined and participated, we turn to the three additional requirements to establish personal jurisdiction over a co-conspirator under New York law (awareness, benefit, and direction or control). *See Berkshire Bank*, 2022 WL 569819, at *3. We find that all three are satisfied.

First, the allegations support the inference that both Fields and Edison were aware of the effects of their activity in New York. As to Fields, the amended complaint alleges that SJ Global WW, for which Fields served as CFO, agreed to do business with New York-based Douglas and PPMT. SJ Global WW "directed PPMT to form entities to be operated from New York which would serve as 'transfer or remittance agents'" for it. App'x 135. SJ Global WW's role was to contribute capital to the resulting entity, New York-based PPMT Fund I LP, which was FAT Brands's counterparty in the funding agreement. This fund was rendered "insolvent and unable to fulfill

11

its contractual obligations to FAT [Brands]" by Fields's "misrepresentations regarding [SJ Global WW's] intent and ability to provide $100 million in financing." App'x 136.

With regard to Edison, the amended complaint alleges that he was deeply involved in the New York-based fraud. Among other things, Edison "issued directives to PPMT and Douglas directly and exerted control over th[e] scheme," advised other SJ Global Defendants, and "issued false representations directly to FAT and PPMT." App'x 136, 161–62. The amended complaint further alleges that Edison's misrepresentations rendered the New York-based PPMT funding vehicle insolvent. We therefore infer that Edison, like Fields, was aware of the impact of his conduct in New York.

Second, the amended complaint plausibly alleges that the New York-based co-conspirators acted to benefit Fields and Edison. It states that the defendants sought to persuade FAT Brands to enter into a financing agreement with an entity in which Fields held a substantial stake. It follows that Fields stood to benefit financially from her co-conspirators' efforts to further the fraud. Although the amended complaint is silent as to the precise nature of Edison's interest in the deal, it does state that he "served as a financial advisor to the other SJ Global Defendants and advised on deal terms relating to the FAT Brands transaction." App'x 161. It is reasonable to infer that Edison would be paid for his services and thus also stood to benefit from the fraud.

The third requirement—that the New York-based co-conspirators acted at the direction or under the control of the out-of-state defendant—may be satisfied by an allegation that the

12

out-of-state defendant was "aware of the torts being committed by" co-conspirators in New York. *Berkshire Bank*, 2022 WL 569819, at *3; *see also Lawati*, 961 N.Y.S.2d at 8 (noting that this requirement is satisfied where a plaintiff alleges "that the out-of-state co-conspirator has knowledge of the tortious acts being perpetrated in New York"). Here, the amended complaint alleges more than knowledge; it alleges that Fields and Edison participated directly in the scheme being executed by, among others, New York-based co-conspirators. Accordingly, we easily infer that they were aware of the torts being committed in New York.

In sum, the district court erred by failing to consider whether the jurisdictional contacts of Fields and Edison's co-conspirators could be attributed to them for purposes of establishing personal jurisdiction.[4] Applying New York's broad approach to agency in this context, we hold that FAT Brands carried its burden of plausibly alleging personal jurisdiction. Accordingly, we vacate the district court's order dismissing Count IV against Fields and Edison.

---

[4] We disagree with the district court to the extent that it found that the "principal-agent relationship between SJ Global WW and the PPMT Defendants had arguably broken down" by the time of the January 2019 Zurich meeting. App'x 265. We note FAT Brands's allegation that Douglas congratulated Edison and Samuel *after* the Zurich meeting and stated his continued willingness to collaborate with the SJ Global Defendants. App'x 163–64.

13

## II.     Whether FAT Brands States a Claim Against the Remaining SJ Global Defendants

Next, FAT Brands argues that the district court erred by dismissing Count IV—fraud and conspiracy to commit fraud—against the remaining SJ Global Defendants for failure to state a claim. The district court held that the amended complaint does not state a claim for fraud because it does not allege that FAT Brands relied on the statements that the SJ Global Defendants made to it directly. The district court then held that the PPMT Defendants' statements to FAT Brands, which did induce detrimental reliance, could not "support a claim against the SJ Global Defendants" because neither Douglas nor PPMT was "acting as [the SJ Global Defendants'] agent[] in making them." App'x 268. FAT Brands points out that the district court did not address whether the amended complaint states a claim against the SJ Global Defendants for conspiracy to commit fraud and, by extension, for the primary fraud tort perpetrated by their co-conspirators, the PPMT Defendants. We agree and hold that FAT Brands states a claim against the SJ Global Defendants both for conspiracy and fraud.

To state a claim for conspiracy to commit fraud, a plaintiff must allege both a primary fraud tort as well as the four elements of conspiracy. *Kashi*, 790 F.2d at 1055. The amended complaint indisputably alleges a primary fraud perpetrated by the PPMT Defendants. Thus, it states a claim for conspiracy to commit fraud against the SJ Global Defendants so long as it plausibly alleges that they conspired with Douglas and PPMT to commit the primary tort. The amended complaint does this.

14

FAT Brands plausibly alleges that each SJ Global Defendant collaborated with the PPMT Defendants to defraud it. They "engaged in a criminal scheme to harm Plaintiff [by] issuing a series of misrepresentations regarding the origins, legitimacy and financial wherewithal of SJ Global WW to fund the FAT transaction" arranged by Douglas. App'x 151. The amended complaint specifies various overt acts taken in furtherance of the scheme, and it identifies significant monetary damages FAT Brands sustained as a result. We therefore conclude that FAT Brands states a claim for conspiracy to commit fraud against the SJ Global Defendants.

It follows that FAT Brands also states a claim for fraud against the SJ Global Defendants. This is so because, under New York law, defendants are liable for the torts of their co-conspirators. *See Grove Press*, 649 F.2d at 123; *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.*, 133 F.2d 187, 189 (2d Cir. 1943) ("[A]llegations of conspiracy . . . . show that [a] wrong was committed jointly by the defendants so that the acts of one may be imputed to the others because of their common purpose and intent."); *Green v. Davies*, 182 N.Y. 499, 504 (1905). FAT Brands unquestionably states a claim for fraud against the PPMT Defendants. Because FAT Brands adequately alleges that the SJ Global Defendants conspired with the PPMT Defendants to commit the fraud, it states a claim against the SJ Global Defendants for the primary fraud tort as well.

Accordingly, we vacate the district court's order dismissing Count IV against the remaining SJ Global Defendants.

15

**III.     Whether FAT Brands States a Claim Against Ramjeet**

FAT Brands also challenges the district court's holding that it fails to state a claim against Ramjeet with respect to Count IX, partnership liability, and Count X, negligent supervision.

**A.     Partnership Liability**

First, the district court held that FAT Brands fails to state a claim for partnership liability because it does not allege an agreement to share losses, as required of partnerships.  The district court explained that the potential losses that FAT Brands identified as shared did not suffice because they were only "the value of . . . services rendered in connection with a collaborative business effort."  App'x 254 (internal quotation marks omitted).  On appeal, FAT Brands argues for the first time that New York law does not require a shared loss agreement if co-venturers do not reasonably anticipate the risk of losses.  And, according to FAT Brands, Ramjeet and Douglas did not expect to sustain losses.

Ramjeet objects that FAT Brands did not raise this argument in the district court.  It is true, as a general matter, that this court "will not consider . . . an argument [that] has not been raised before the district court."  *Mago Int'l v. LHB AG*, 833 F.3d 270, 274 (2d Cir. 2016) (internal quotation marks omitted).  We may, however, consider new issues in order "to avoid manifest injustice" or "where the issue is purely legal and there is no need for additional fact-finding."  *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir. 1996).

Both circumstances are present here.  Whether FAT Brands pleads facts sufficient to establish that Ramjeet and Douglas had no

expectation of losses is a question of law that can be resolved based on the amended complaint without additional fact-finding. The equities also militate in favor of considering the new argument because it appears from the amended complaint that Ramjeet either had knowledge of Douglas's fraud or disregarded obvious signs of it. FAT Brands alleges that Ramjeet "subsidize[d], promote[d] and legitimize[d]" Douglas's operation by providing it with office space, allowing it to "represent[] it[self] to be part of the [Ramjeet-controlled] PPMT family of companies," and serving as its CFO and treasurer. App'x 164–66. The amended complaint also plausibly alleges that Ramjeet took part directly in the fraud by attending a meeting with FAT Brands at which he "corroborated Douglas'[s] boasts that he had procured a firm commitment from the Royal Family of Qatar to invest in FAT Brands and in other deals." App'x 168. Because the amended complaint plausibly alleges that Ramjeet was an active participant in the fraud, avoidance of manifest injustice allows us to consider FAT Brands's new argument.

We find FAT Brands's new argument persuasive. Under New York law, a joint venture can be formed without loss-sharing where "there was no reasonable expectation of losses." *Don v. Singer*, 939 N.Y.S.2d 363, 364 (N.Y. App. Div. 2012); *accord Cobblah v. Katende*, 713 N.Y.S.2d 723, 724 (N.Y. App. Div. 2000). This rule also applies to partnerships because "joint ventures are governed by the same legal rules as partnerships" in New York. *Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001) (citing *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 243 (2d Cir. 1989)).

We can reasonably infer that Douglas and Ramjeet did not anticipate losses. The amended complaint outlines in detail the

17

business arrangement between Ramjeet and Douglas. It explains that the enterprise's business model did not include assuming credit risk or, indeed, any losses other than unrecouped overhead expenses. Reading these allegations in the light most favorable to FAT Brands, we conclude that Ramjeet and Douglas did not anticipate the risk of losses. We therefore vacate the district court's dismissal of Count IX. We do not, however, opine on whether FAT Brands properly pleads the other elements necessary to establish the existence of a partnership, a question that the district court did not address. On remand, the district court must determine whether the amended complaint states a claim for partnership liability in light of the other partnership factors it previously identified and in light of our ruling that loss sharing is not indispensable to FAT Brands's claim.

### B.  Negligent Supervision

As to Count X, the district court held that FAT Brands fails to state a claim for negligent supervision because the amended complaint does not allege an employer-employee relationship between Ramjeet and Douglas. On appeal, FAT Brands argues that such a relationship is not necessary for a negligent supervision claim where "special circumstances" indicative of a supervisory relationship exist. FAT Brands's argument is unpersuasive because, even assuming that such an exception exists, the amended complaint does not allege such circumstances.

Under New York law, a negligent supervision claim generally requires, among other things, that a plaintiff establish that "the tortfeasor and defendant were in an employee-employer relationship." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633

F.3d 81, 94 (2d Cir. 2011) (citing *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam)). Although we have never held that supervisory liability can attach outside the context of the employer-employee relationship, and, indeed, we have suggested the opposite, *see, e.g.*, *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019), FAT Brands points to several New York courts that, it says, have recognized such an exception. We need not engage with this potential conflict, however, because the state court cases cited by FAT Brands involve relationships in which defendants exercised a high degree of control over the principal tortfeasors, an allegation that is absent from the amended complaint.

FAT Brands cites, for example, *Krystal G. v. Roman Catholic Diocese of Brooklyn*. 933 N.Y.S.2d 515 (N.Y. Sup. Ct. 2011). In that case, the court held that a pastor could be held liable for negligently supervising an assistant pastor. *Id.* at 522–23. The court inferred that the pastor was responsible for supervising his assistant from the fact that the pastor "was responsible for day-to-day operations" and "oversight" of the church. *Id.* at 523. Similarly, in *Reitano v. Nilsen*, a school principal and superintendent were liable for negligently supervising a teacher who was "under their supervision." 2006 NYLJ LEXIS 4124, at *8 (N.Y. Sup. Ct. Aug. 16, 2006). Still other cases cited by FAT Brands suggest that an even higher level of control over the principal tortfeasor is required: that of a custodial relationship. *See Purdy v. Pub. Adm'r of Cnty. of Westchester*, 72 N.Y.2d 1, 8 (1988); *D'Amico v. Christie*, 71 N.Y.2d 76, 88–89 (1987).

Here, by contrast, FAT Brands does not allege facts from which we can plausibly infer that Ramjeet supervised or controlled Douglas. To be sure, it alleges that Ramjeet participated in the fraud and

supported Douglas, but these allegations fall short of the type of control present in those cases in which New York courts have found that supervisory liability attaches outside of the employer-employee context. Rather, FAT Brands's allegations are more consistent with a partnership relationship than a supervisory one. *See, e.g.*, Appellant Br. 52 (noting that the amended complaint "alleges that Ramjeet discussed the status of . . . negotiations . . . with Douglas . . . . and agreed to share any profits" with him).

None of the allegations specified by FAT Brands supports an inference that Ramjeet supervised Douglas. These allegations include that Ramjeet legitimized Douglas by allowing him to use the PPMT name, "represented to FAT [Brands] that he exercised supervisory authority over Douglas," and was Douglas's "supervisor in fact" by virtue of his role as PPMT's CFO and treasurer. Appellant Br. 54. First, Ramjeet's lending the imprimatur of the PPMT brand does not indicate that he controlled Douglas. Second, the allegation regarding Ramjeet's *representation* to FAT Brands is both conclusory and only modestly relevant to whether he did *in fact* supervise Douglas. While Ramjeet may have "held himself out . . . as exercising supervisory authority over Douglas," App'x 165, nothing in the amended complaint suggests that he actually did exercise such authority. Third, it is illogical to conclude that Ramjeet's subordinate position as CFO and treasurer of PPMT relative to Douglas, the managing partner and CIO, gave him supervisory authority over Douglas. Contrary to FAT Brands's unwarranted assertion, control over the ability to "cut checks" does not transform a financial officer into a "supervisor in fact" of all other corporate officers. Appellant Br. 54.

Because the amended complaint does not allege the requisite control relationship between Ramjeet and Douglas, FAT Brands fails to state a claim for negligent supervision. Even if we were to accept FAT Brands's view that negligent supervision claims under New York law are cognizable outside of the employer-employee context, we would reach the same result. Accordingly, we affirm the district court's order dismissing Count X.

## CONCLUSION

For the forgoing reasons, we VACATE the district court's order dismissing Counts IV and IX and AFFIRM its order dismissing Count X. The case is REMANDED to the district court for proceedings consistent with this opinion.