*Chatham Capital Holdings, Inc. v. Conru*

In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2023
Argued: October 4, 2023
Decided: January 31, 2024

Docket No. 23-154

CHATHAM CAPITAL HOLDINGS, INC., CHATHAM CAPITAL MANAGEMENT IV, LLC,

*Plaintiffs-Appellants*,

v.

ANDREW B. CONRU, as Trustee for the Andrew B. Conru Trust, FRIENDFINDER NETWORKS, INC., INTERACTIVE NETWORK, INC.,

*Defendants-Appellees*,

JOHN and JANE DOES 1-5,

*Defendants*.

_____

Before:          JACOBS, WESLEY, and ROBINSON, *Circuit Judges*.

_____

Plaintiffs-Appellants, two investment firms, hold debt securities issued by Defendant-Appellant FriendFinder Networks, Inc., and an affiliate. FriendFinder issued the securities through an exchange offer. Several years after the exchange offer, FriendFinder's founder, acting through a trust in his own name, reduced the securities' payment terms under the governing Indenture. According to the

Plaintiffs-Appellants, FriendFinder's founder sought to force them to sell their stake back to FriendFinder at a discount.

The Plaintiffs-Appellants sued in state court, bringing common-law contractual claims related to the Indenture. After the case was removed to federal court, the Plaintiffs-Appellants sought leave to amend their complaint to add federal claims, contending primarily that the Trust Indenture Act ("TIA"), 15 U.S.C. §§ 77aaa *et seq.*, protected the Indenture and prevented FriendFinder and its founder from changing the payment terms without the Plaintiffs-Appellants' consent. The United States District Court for the Southern District of New York (Cote, *J.*) disagreed, dismissed the case, and denied leave to amend to add claims under the TIA.

The TIA does not protect this Indenture because the underlying exchange offer was a private placement under the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* The TIA, as relevant here, does not apply to private placements. Absent the TIA's protections, a "no-action" clause in the Indenture bars the Plaintiffs-Appellants' lawsuit.

We therefore **AFFIRM** the district court's judgment of dismissal.

_____

STEVEN M. KAYMAN (Stacy L. Ceslowitz, *on the brief*), Rottenberg Lipman Rich, P.C., New York, NY, *for Plaintiffs-Appellants*.

LAWRENCE ROBBINS (Jeffrey R. Wang, Alexandra Elenowitz-Hess, *on the brief*), Friedman Kaplan Seiler Adelman & Robbins LLP, New York, NY, *for Defendants-Appellees*.

_____

2

WESLEY, *Circuit Judge*:

This case turns upon the scope of the Trust Indenture Act ("TIA"), one of our federal securities laws.

"After rampant abuses in the securities industry led to the 1929 stock market crash and the Great Depression, Congress enacted a series of laws to ensure that 'the highest ethical standards prevail in every facet of the securities industry.'" *Kokesh v. SEC*, 581 U.S. 455, 457–58 (2017) (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186–187 (1963)). The initial law was the Securities Act of 1933. *See* 15 U.S.C. §§ 77a *et seq.* The Securities Act imposes registration requirements for public offerings of a broad array of securities. *Id.* § 77e. Conversely, the Securities Act exempts private offerings—specifically, "transactions by an issuer not involving any public offering"—from registration. *Id.* § 77d(a)(2). This "Private Placement Exemption" recognizes that sophisticated private investors generally need fewer protections and can "fend for themselves" in the market. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953).[1]

---

[1] Although the Securities Act and the TIA are codified in Title 15 of the United States Code, courts and practitioners commonly refer to the original sections of each standalone securities law. Thus, the Private Placement Exemption, codified at 15 U.S.C. § 77d(a)(2), is also known as Section 4(a)(2) of the Securities Act.

3

The TIA joined the securities laws six years later, in 1939. *See* 15 U.S.C. §§ 77aaa *et seq.* As a supplement to the Securities Act, the TIA addresses problems particular to *debt* securities (for example, bonds or notes). Because debt securities provide fixed rates of payment, they are typically governed by a contract— referred to in the industry as an "indenture"—with a trustee who oversees the securities. Before the TIA was passed, conflicts of interest between trustees and issuing companies had harmed investors in debt markets. *See id.* § 77bbb. The TIA guards against such conflicts by providing indentures with special protections. For instance, an indenture will often purport to contain a "no-action" clause which blocks investors from suing the trustee or the issuing company for breaching the indenture. If the TIA applies, it invalidates that no-action clause and guarantees those investors' right to sue. *See id.* § 77ppp(b); *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 7 (2d Cir. 2017) (citing *Cruden v. Bank of New York*, 957 F.2d 961, 967–68 (2d Cir. 1992)).

The TIA, however, does not protect every indenture. Rather, it mirrors the Securities Act's general structure and invokes the Private Placement Exemption: It does not protect *private* offerings of debt securities. *See* 15 U.S.C. § 77ddd(b). The TIA's scope is limited to indentures which govern securities offered publicly.

4

Here, pursuant to an Indenture, the Plaintiffs-Appellants (together, "Chatham") acquired debt securities issued by FriendFinder Networks, Inc., and an affiliated company Interactive Network, Inc. (together, "FriendFinder"). Chatham acquired its securities through an "exchange offer," by which it exchanged preexisting FriendFinder notes for the new securities. Several years later, FriendFinder's founder gained voting control over the Indenture and reduced the securities' payment terms—allegedly, to strong-arm Chatham into selling its own stake back to FriendFinder at a steep discount. The primary question is whether the TIA applies, invalidates the Indenture's no-action clause, and guarantees Chatham's right to sue to remedy the devalued securities.

The TIA does not apply. The underlying exchange offer was a private—rather than public—offering limited to preexisting FriendFinder investors. The no-action clause bars Chatham's lawsuit because Chatham has not met the clause's prerequisites to sue, and the TIA does not invalidate the no-action clause. We therefore affirm the district court's judgment of dismissal.

5

## BACKGROUND

### A.     The Exchange Offer.

Chatham is a pair of affiliated private investment firms.  Some years ago, it acquired debt notes, issued by FriendFinder, worth millions of dollars.  Those original notes had a fixed maturity date and interest rate.

The key transaction—the exchange offer—took place several years later.  In essence, FriendFinder sought to convince Chatham and other investors to restructure their existing investments.  Upon accepting the exchange offer, each investor would swap their original notes for a combination of new debt securities (with an extended maturity date) and FriendFinder stock.  Only investors who already held notes with FriendFinder were eligible for the exchange offer.  The general public could not participate.

Investors in the exchange offer fell into two categories under the Securities Act.  The first category comprised domestic investors located "in the United States" who would complete "a private transaction in reliance upon the exemption from the registration requirements of the Securities Act provided by Section 4(a)(2) thereof . . . ."  Joint App'x at 250.  The second category comprised investors located "outside  the  United  States"  who  would  complete  "offshore  transactions  in

6

compliance with Regulation S under the Securities Act." *Id.*[2] These categories—

domestic and offshore—matter because an investor's location can implicate

different registration and filing requirements under the securities laws.

Chatham accepted the exchange offer. It received its new securities through

a domestic transaction. Several other investors received their new securities

through an offshore transaction. Regardless of their locations, though, every

investor had to acknowledge in the offering materials that their new debt securities

were being "privately placed" with them—such that the transaction did "not

involv[e] a public offering." *Id.*

## B. The Indenture.

Chatham's debt securities are governed by the Indenture. It contains two

provisions which define a securityholder's ability to sue.

---

[2] The Securities and Exchange Commission ("SEC") has general authority to promulgate rules and regulations to carry out the provisions of the Securities Act. *See* 15 U.S.C. § 77s(a). Regulation S is one such regulation. As discussed below, Regulation S sets forth categories of offshore transactions and explains that the SEC will not enforce the Securities Act's registration requirements for those transactions. In other words, Regulation S provides safe harbors from enforcement.

First, the "no-action" clause (Section 5.7) limits a holder's ability to sue in court.[3] It notes that holders like Chatham "may not pursue any remedy with respect to this Indenture or the Securities *unless*" five conditions are met. *Id.* at 358 (emphasis added). The first is that the holder must provide written notice to the Indenture's trustee that an "Event of Default" is ongoing.[4] The Indenture lists situations which would constitute an "Event of Default," including FriendFinder's failure to pay principal, premium, or interest on the securities within 10 days of

---

[3] As relevant here, the no-action clause reads:

> SECTION 5.7. <u>Limitation on Suits</u>. Subject to Section 5.8, a Holder may not pursue any remedy with respect to this Indenture or the Securities *unless*:
>
> (a) such Holder has previously given to the Trustee written notice stating that an Event of Default is continuing;
>
> (b) Holders of at least 25% in principal amount of the outstanding Securities have requested that the Trustee pursue the remedy;
>
> (c) such Holders have offered to the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense;
>
> (d) the Trustee has not complied with such request within 60 days after receipt of the request and the offer of security or indemnity; and
>
> (e) the Required Holders have not given the Trustee a direction that, in the opinion of the Trustee, is inconsistent with such request during such 60-day period. . . .

Joint App'x at 358 (emphasis added).

[4] The Indenture's trustee is not a party in this case and is not alleged to have participated in any wrongdoing.

their due date. The parties agree that no "Event of Default" has occurred, and that neither the no-action clause's first condition nor any of the other four have been satisfied.

Second, the "payment carve-out" clause (Section 5.8) makes clear that holders like Chatham can always "bring suit for the enforcement" of their "right . . . to receive payment of principal of, premium (if any), or interest on the Securities" on or after those payments' due dates. *Id.* Holders may sue to enforce this payment right without needing to comply with the conditions in the no-action clause.

## C. The Dispute.

Several years after Chatham completed the exchange offer, another investor increased its stake to become the Indenture's "Supermajority Holder." A Supermajority Holder is an investor who holds more than 67% of the entire issuance. Critically, the Supermajority Holder can vote to amend the Indenture and change the securities' core payment terms (their interest rate and maturity date) without consent from Chatham or the other minority holders.

The Supermajority Holder who emerged was none other than a trust in the name of FriendFinder's founder, Andrew Conru (the "Conru Trust"). The Conru

9

Trust had bought up securities from other holders to increase its stake to around 85% of the entire issuance.

Wielding its newfound Supermajority Holder power, the Conru Trust allegedly began coordinating with FriendFinder to strong-arm other investors. In particular, Chatham claims that FriendFinder and its founder devalued the securities to try and coerce Chatham into selling its own stake at a steep discount.

The coercion allegedly worked as follows. Soon after the Conru Trust gained Supermajority Holder control, FriendFinder approached Chatham and offered to buy back its securities at 70% of their principal amount. Chatham declined the offer. A few weeks later, the Supermajority Holder voted to amend the Indenture (the "Amendment"). The Amendment devalued the securities by reducing their core payment terms; it cut their interest rate in half and extended their maturity date by a decade. Once the Amendment took effect, FriendFinder made an even lower offer to buy back Chatham's securities—this time, for 65% of their principal amount. Chatham again declined.

Chatham then filed this action in New York state court against FriendFinder and the Conru Trust, contending that the Amendment was invalid. Chatham brought claims for breach of the Indenture and breach of the covenant of good

10

faith and fair dealing. It also sought a declaratory judgment that the Amendment was unenforceable.

After removing the case to federal court, FriendFinder and the Conru Trust moved to dismiss the case, while Chatham moved to amend its complaint to reframe its contractual claims under the TIA. The district court (Cote, *J.*) dismissed the case, reasoning that the Indenture's no-action clause barred Chatham's lawsuit and that amending the complaint would be futile because the TIA did not apply. Chatham appeals the dismissal.

## DISCUSSION [5]

### A. The No-Action Clause Bars this Lawsuit.

At the outset, Chatham's lawsuit faces a contractual roadblock: The Indenture's no-action clause. "Such no-action clauses frequently are included in indentures to limit suits arising from those agreements." *McMahan & Co. v.*

---

[5] Our standard of review is well-established. "We review the grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023). In so doing, we "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). We likewise review *de novo* the district court's interpretation of the TIA and its application to an indenture. *See Marblegate*, 846 F.3d at 6.

11

*Wherehouse Ent., Inc.*, 65 F.3d 1044, 1050 (2d Cir. 1995). They are "strictly construed" under New York law,[6] but "have been enforced in a variety of contexts in both federal and state courts." *Id.* (quoting *Cruden*, 957 F.2d at 968). Here, the district court properly enforced the no-action clause.

The no-action clause prevents a holder like Chatham from seeking "any remedy" regarding the debt securities "unless" it satisfies the five pre-suit conditions. First, Chatham must provide notice to the Indenture's trustee that an "Event of Default" has occurred. Given that there was no "Event of Default," Chatham concedes that it did not—and could not—provide proper notice. Accordingly, Chatham has not satisfied the no-action clause's conditions and presently cannot pursue "any remedy."

Chatham attempts to flip this condition to its advantage. It argues that the lawsuit bar is not triggered until an "Event of Default" has occurred. In Chatham's view, until a default occurs, there is nothing to notify the Indenture's trustee about. The no-action clause would thus allow Chatham, in its view, to sue over disputes that do not rise to the level of a default.

---

[6] The parties agree that the Indenture is governed by New York law.

12

Chatham misreads the no-action clause. The clause's first part sets the status quo: Chatham "may not pursue any remedy with respect to this Indenture or the Securities." The second part identifies the exception to the status quo: Chatham cannot sue *unless* five requirements are met, including notice of an "Event of Default." The five subparts are not preconditions before the entire clause takes effect; they are preconditions (they follow the word "unless") before Chatham can sue. *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, 948 N.Y.S.2d 580, 581 (1st Dep't 2012) (holding that plaintiffs were not "excused from complying with the 'Event of Default' provision because of the alleged impossibility of showing such an event"); *ACE Sec. Corp. v. DB Structured Prod., Inc.*, 977 N.Y.S.2d 229, 231 (1st Dep't 2013) (no-action clause precluded claim when basis of claim was not a "default"), *aff'd*, 25 N.Y.3d 581 (2015). In other words, the preconditions do not turn the ability to sue off; they are required to turn that ability on. The no-action clause applies to this lawsuit by its own terms.

Nor are we persuaded that Chatham can invoke the payment carve-out from the no-action clause. The payment carve-out guarantees holders the right to sue to enforce "payment" of the securities' principal and interest if those amounts are not paid by their due dates. Chatham says that its lawsuit seeks to enforce the

13

larger payments it was receiving before the securities were devalued. But Chatham does not allege that FriendFinder has failed to pay the principal and interest at the new (lesser) rates authorized by the Amendment. In fact, the Indenture defines the non-payment of principal or interest as an "Event of Default," which Chatham agrees has not occurred.

What Chatham really challenges is not missed payments, but the validity of the Amendment to the Indenture itself. We have explained, however, that claims which "assert breaches of the Trust Indenture Act and the Indenture[]" are "not" claims "for non-payment of principal or interest as such" that would fall within this carve-out. *Cruden*, 957 F.2d at 968; *see also Emmet & Co. v. Cath. Health E.*, 951 N.Y.S.2d 846, 851 (N.Y. Sup. Ct. 2012) (reasoning that construing the payment carve-out to "allow all claims relating to the value of the bond" would "swallow the no-action clause"), *aff'd*, 980 N.Y.S.2d 762 (1st Dep't 2014). The payment carve-out does not save Chatham's lawsuit.

## B.     The TIA Does Not Invalidate the No-Action Clause.

Because the no-action clause applies on its face, Chatham's lawsuit is barred unless the TIA invalidates that no-action clause. We conclude that it does not. The TIA does not apply; the Indenture's own provisions govern.

14

Recall that the TIA does not target private offerings—only public ones. When offerings fall within the Private Placement Exemption, they are exempt from the Securities Act's registration requirements, and are likewise exempt from the TIA's protections.

Here, the offering documents attached to Chatham's pleadings make clear that the exchange offer was a completely private offering. And the fact that the offering was made partially offshore does not affect its private nature.

### i. The Exchange Offer Falls Within the Private Placement Exemption.

FriendFinder's exchange offer—to Chatham and to every other offeree—falls within the Private Placement Exemption, which encompasses any "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). In general, "a limited distribution to highly sophisticated investors, rather than a general distribution to the public, is not a public offering." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1090–91 (9th Cir. 2010). This exchange offer involved a limited distribution: It was made only to preexisting FriendFinder investors who held preexisting FriendFinder notes. Before offerees could participate, each had to warrant that it was an experienced investor who had received sufficient financial and other information from FriendFinder to make an

15

informed investment decision. Chatham, for example, styles itself as a private investment firm "concentrating on investing in lower to middle-market companies with sustainable cash flow from operations." Joint App'x at 219. The Private Placement Exemption is designed for investors, like Chatham, who are able "to fend for themselves." *Ralston Purina*, 346 U.S. at 125.

Chatham does not dispute any of this for domestic investors like itself, but speculates that offshore investors, outside of the United States, might have accepted their securities via a public offering. Yet Chatham concedes that it has alleged no facts suggesting that any offshore investor actually did so. On the contrary, the offering documents make clear that the entire exchange offer was private, regardless of an offeree's location. Those documents required every investor—including every offshore investor—to warrant multiple times that their securities were going to be privately placed with them.

Because this offering falls under the Private Placement Exemption, the TIA's protections do not apply.

### ii. Regulation S Does Not Displace the Private Placement Exemption.

Finally, Chatham maintains that the TIA can still protect private offerings which are made (at least partially) offshore, because offshore regulations trigger

16

the TIA even when the Private Placement Exemption does not. We disagree. For purposes of the TIA, the offering's private nature is what controls.

Regulation S governs offshore offerings. *See* 17 C.F.R. §§ 230.901 *et seq.* Under Regulation S, an issuer who makes an offshore offering need not file a registration statement with the SEC, just as an issuer who makes a private offering need not do so. Despite their overlapping goals, Regulation S provides safe harbors from registration requirements as a matter of SEC enforcement policy, while the Private Placement Exemption waives them as a matter of statute.

Given this difference, however slight, between safe harbors and statutory exemptions, it is possible that the TIA could reach some securities offered offshore under Regulation S.[7] After all, the TIA applies to debt security offerings unless one of its exemptions applies, and it lists no exemption for offshore offerings. *See* 15 U.S.C. § 77ddd. Seizing on this silence, Chatham reasons that the TIA must

---

[7] Put differently, the TIA might reach offshore offerings made under Regulation S when they are *public*. The SEC itself has refrained from taking TIA enforcement action against Regulation S offerings. *See* SEC, Offshore Offers and Sales, 55 Fed. Reg. 18306, 18320 (May 2, 1990) ("Regulation S Release"). The SEC's non-enforcement policy might bear on public offerings, but the Private Placement Exemption already provides the answer for offshore private offerings.

apply to the entire exchange offer—even if the entire offer was private—because it was made partially offshore under a regulation that *could* implicate the TIA.

That argument misses the mark. Whether an offering is public or private does not depend on whether it occurs inside or outside the United States. The TIA already provides a complete exemption for private offerings; it need not provide an additional exemption for offshore offerings under Regulation S. Chatham cites no authority indicating that Regulation S somehow displaces the plain text of the TIA and the Private Placement Exemption.[8] Again, the Private Placement Exemption encompasses "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). That language contains no geographic limitation treating private offerings any differently whether they are domestic or offshore.

---

[8] Even if the TIA was unclear and we looked to SEC guidance, "our holding is consistent with the SEC's position" that the Private Placement Exemption overrides Regulation S. *Ret. Bd. of the Policemen's Annuity & Ben. Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 169–70 (2d Cir. 2014). In its release accompanying Regulation S, the SEC confirmed that "[r]eliance on one of the safe harbors does not affect the availability of any exemption from the Securities Act registration requirements upon which a person may be able to rely." Regulation S Release, 55 Fed. Reg. at 18308. Likewise, the SEC reiterated that Regulation S does not alter the TIA's baseline rule: The TIA "applies generally" to debt securities "unless an exemption is available." *Id.* at 18320. Here, an exemption is available for private offerings.

We therefore hold that the Indenture is exempt from the TIA's protections. Those protections do not apply to private offerings like the underlying exchange offer made here. Accordingly, we agree with the district court that the no-action clause bars Chatham's lawsuit, and that it would be futile for Chatham to amend its complaint to add claims under the TIA.

## CONCLUSION

We have considered Chatham's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

19